IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KEITH COOPER,                        )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )    CIVIL ACTION NO. 23-0309-MU
                                     )
AIRBUS AMERICAS, INC.,               )
                                     )
        Defendant.                   )

## ORDER

This matter is before the Court on Defendant Airbus Americas, Inc.'s Motion for

Summary Judgment and brief in support (Docs. 66, 67), Plaintiff's response in

opposition to summary judgment (Doc. 73), Defendant's reply brief (Doc.74),

Defendant's Motion to Strike Portions of Plaintiff's Evidentiary Submissions (Doc. 75),

Plaintiff's response to the motion to strike (Doc. 76), and Defendant's reply (Doc. 77).

The Court finds that Defendant's motion to strike (Doc. 75) is **GRANTED in part** and

**DENIED in part,** as set forth below. Upon consideration of the parties' briefs, all

evidentiary materials submitted, and the relevant law, the Court finds that Defendant's

Motion for Summary Judgment is due to be **GRANTED**.

## I. Introduction

Plaintiff Keith Cooper, an African American male, was employed as a

Manufacturing Engineer at the Airbus facility in Mobile, Alabama from February 15,

2021 until his termination on September 10, 2021. Following his termination, Plaintiff

submitted a Charge of Discrimination and Retaliation to the EEOC and, after receiving

his right to sue letter, filed this action and several amendments, asserting claims under

Title VII and under § 1981 for race discrimination and retaliation in employment,
retaliation in violation of the Whistleblower Protection Act, and retaliation in violation of
the Family and Medical Leave Act ("FMLA") against his former employer Airbus. (Docs.
1, 31, 60). The Court previously dismissed the Whistleblower Protection Act claims set
forth in Count III of his first Amended Complaint. (Doc. 56). Airbus argues that it is
entitled to summary judgment in its favor as to the remaining claims because: (1)
Plaintiff cannot state a prima facie case of race discrimination; (2) Airbus had legitimate,
non-discriminatory reasons for its actions; (3) Plaintiff cannot establish a prima face
case of retaliation because, at a minimum, there was no causation; and (4) there is no
genuine issue of material fact as to Plaintiff's FMLA claim. (Doc. 67).

## II. Motion to Strike

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides "[a] party may
object that the material cited to support or dispute a fact cannot be presented in a form
that would be admissible in evidence." The Advisory Committee Notes specify that "[t]he
burden is on the **proponent** to show that the material is admissible as presented or **to
explain the admissible form that is anticipated**." Fed. R. Civ. P. 56, *Adv. Comm.
Notes*, "Subdivision(c)" (2010 Amendments) (emphasis added); *accord Wilkinson v.
Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1566-67 (11th Cir. 1991)(holding that it was
reversible error for District Court to admit employee's testimony under Rule 801(d)(2)(D)
where "plaintiff has offered not one whit of evidence … to lay a predicate for the
admissibility of the statement"). As grounds for its objections, Airbus contends that
certain portions of the evidence Plaintiff relies upon in opposing summary judgment
contains inadmissible hearsay or is otherwise inadmissible. (Doc. 75). Having reviewed

Airbus's motion, Plaintiff's response, and the applicable law, which the Court recognizes includes a different admissibility standard at this stage than at trial, the Court finds that Airbus's motion to strike is **GRANTED in part** and **DENIED in part** as set forth below.

## A.  Plaintiff's Declaration

Defendant objects to several statements set forth in Plaintiff's Declaration, Doc. 72-1. The Court will address each of these by category based upon the grounds for the objection.

### 1. Contradict prior sworn testimony

 - Paragraph 5 – Airbus argues that Plaintiff's statement concerning what his mentor told him concerning the length of training was inconsistent with his deposition testimony. The Court has reviewed the declaration statement and the cited deposition testimony and does not find the former to be inconsistent with the latter; therefore, Airbus's motion to strike this statement in Plaintiff's declaration is **DENIED.**

- Paragraph 8 – Airbus asserts that Plaintiff's statement that Mattocks and Burt took no meaningful action to address his concerns is inconsistent with his deposition testimony in which he stated that he didn't know if they took any actions to address his concerns and with uncontroverted evidence showing that they did take action. Having reviewed the declaration statement and the cited evidence, the Court agrees that this statement is inconsistent with Plaintiff's own testimony and the evidence; therefore, Airbus's motion to strike this statement in Plaintiff's declaration is **GRANTED.**

- Paragraphs 14 and 16 – Airbus argues that Plaintiff's statements concerning his return to work in July of 2021 and his PIP assessments were inconsistent with his deposition testimony and evidence in the record. Having reviewed the declaration

statements and the cited evidence, the Court agrees that these statements are inconsistent with Plaintiff's own testimony and the evidence; therefore, Airbus's motion to strike these statements in Plaintiff's declaration is **GRANTED.**

    2. <u>Mischaracterizes the evidence</u>

- Paragraphs 5, 8, and 16 have been addressed above.

- Paragraph 11 will be addressed below.

    3. <u>Not relevant or material</u>

- Paragraph 2 – Airbus argues that Plaintiff's description of the training he received in his former position is not relevant or material. The Court finds that this testimony is arguably relevant and material and that Airbus's objection goes to the weight of the evidence, rather than whether it can be considered by the Court in its evaluation of its summary judgment motion. Accordingly, Airbus's motion to strike paragraph 2 is **DENIED.**

  - Paragraph 11 – Airbus argues that Plaintiff's statements concerning a BOLO being issued while he was on leave are not relevant or material to his claims in this action. Having considered this argument and Plaintiff's response, because the Plaintiff claims that this was an adverse employment action taken by Airbus against him, the Court finds that these statements are relevant and material to Plaintiff's claims at the summary judgment stage; therefore, Airbus's motion to strike these statements in Plaintiff's declaration is **DENIED.**

  - Paragraph 15 – As discussed above, the Court finds that Plaintiff's statements concerning alteration of the PIP are relevant and material because he again claims that

alteration of the PIP was an adverse employment action; therefore, Airbus's motion to strike this statement in paragraph 15 is **DENIED.**

    4. <u>Conclusory allegations, speculation, and conjecture</u>

- Paragraph 7 – Airbus argues that Plaintiff's statement that co-employees shooting him with Nerf guns while he worked "created a hostile work environment that disrupted [his] ability to focus and learn" is impermissibly conclusory. The Court acknowledges that these actions may not create a "hostile work environment" in a legal sense but finds that Plaintiff may have found his co-workers actions to be hostile and disruptive; therefore, the motion to strike this paragraph on this ground is **DENIED.**

- Paragraph 9 – Airbus argues that Plaintiff's statements in this paragraph are conclusory allegations and conjecture without factual support. The Court agrees; therefore, Airbus's motion to strike Paragraph 9 is **GRANTED.**

- Paragraph 12 – Airbus maintains that Plaintiff's statements that Bousquet was "dismissive, unhelpful, and hostile" are not supported by facts; however, in Paragraphs 12 and 13, Plaintiff presented specific examples of Bousquet's actions toward him. Accordingly, Airbus's motion to strike Paragraph 9 is **DENIED.**

- Paragraph 15 – The Court agrees with Airbus that Plaintiff's statement in Paragraph 15 that the PIP was based on vague and subjective criteria is not supported by evidence and is an impermissible conclusory statement; therefore, Airbus's motion to strike this statement in Paragraph 15 is **GRANTED.**

## B. <u>Quarterly Production Bonus</u>

Airbus seeks to strike Exhibit 9, Plaintiff's Quarterly Production Bonus document, on the ground that there is no evidence that these bonuses were a reflection of

Plaintiff's job performance or in any way related to Airbus's assessment of his progression as a manufacturing engineer and, therefore, is not relevant or material. Plaintiff has failed to refute this argument by showing the relevance of the Quarterly Production Bonus document with admissible evidence. Therefore, at this juncture in the proceedings, the Court finds that the Quarterly Production Bonus document is not relevant or material to the claims made. Accordingly, Airbus's motion to strike Plaintiff's Exhibit 9, the Quarterly Production Bonus document, is **GRANTED.**

## C. BOLO

Airbus submits that Plaintiff's Exhibit 10, the "Be On The Lookout" (BOLO) document that was given to security officers at Airbus when Plaintiff was on FMLA leave, is due to be stricken because it is not relevant or material to the claims presented. As discussed above, Plaintiff claims that the BOLO was an adverse employment action taken against him in retaliation for making complaints about racial discrimination, therefore, at this stage of the proceeding, the Court finds that it is relevant and material and, accordingly, **DENIES** Airbus's motion to strike Exhibit 10.

## D. Transcripts of Recordings

Airbus seeks to have the Court strike the transcripts of recordings made by Plaintiff which were submitted in support of his opposition to the motion for summary judgment as Exhibits 14 through 18 on the grounds that, although admittedly the recordings themselves were produced to Airbus with Plaintiff's initial disclosures, Plaintiff did not provide the transcripts of the recordings that he submitted in opposition to the motion for summary judgment prior to filing them. Airbus argues that this in some way put them at a disadvantage; however, the Court notes that Airbus had seven days

from the date that Plaintiff filed his opposition, with the transcripts attached, before the filing date of their reply brief. If Airbus's counsel could not have compared the transcripts to the recordings during that period of time, Airbus could have sought an extension of time from the Court to do so. Therefore, the Court finds this argument to be frivolous. Airbus further argues that these exhibits are due to be stricken because Plaintiff has not authenticated the voices on the recordings and because they are not the best evidence, as the recordings themselves would be the best evidence. The Court also rejects these arguments. Plaintiff has stated that he can authenticate these recordings and, as noted above, to be considered at the summary judgment stage, the "***proponent*** [must be able] to show that the material is admissible as presented or ***to explain the admissible form that is anticipated***." Fed. R. Civ. P. 56, *Adv. Comm. Notes*, "Subdivision(c)" (2010 Amendments) (emphasis added). Also, at the summary judgment stage, transcripts of recordings are acceptable and, often, preferred. Accordingly, the Court **DENIES** the motion to strike Exhibits 14 through 18.

## E. Teamwork Certificate

Finally, Airbus objects to exhibit 24, a Teamwork Certificate issued to Plaintiff in January of 2020, more than a year prior to him becoming a manufacturing engineer. The Court agrees that, because this Certificate substantially predated his work as a manufacturing engineer, it is not relevant or material to the claims asserted in this action. Accordingly, Airbus's motion to strike Exhibit 24 is **GRANTED.**

### III. **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. Rule 56(c).

The moving party, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If

the nonmoving party fails to make "a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. In assessing whether the nonmoving party has met its burden, "the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter…. Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). Likewise, conclusory allegations are insufficient to create a genuine issue of material fact and, therefore, do not suffice to defeat a motion for summary judgment. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) ("conclusory assertions…, in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *AGSouth Genetics, LLC v. Cunningham*, No. CA 09-745-C, 2011 WL 1833016, at *2 (S.D. Ala. May 13, 2011).

## IV.  Findings of Fact

Airbus Americas is a commercial aircraft manufacturer, which opened its first commercial aircraft production facility, known as the Final Assembly Line ("FAL") in Mobile, Alabama in 2015. (PageID. 318-319, 517, 563). At the FAL, Airbus produces

both the A320 and the A220 aircraft. (PageID. 319, 616). There are two primary work areas at the FAL: the flightline, where the aircraft comes in when manufacturing is complete, and the flowline, where the actual building process occurs. (PageID. 319, 617). At all relevant times, Airbus has had in place an Equal Employment Opportunity Policy, which prohibits all forms of unlawful discrimination and retaliation. (PageID. 321-323, 473-474, 517, 617, 653).

After completing a two-year program, Plaintiff Keith Cooper received an Associate's degree in applied science in Drafting Design from ITT Technical Institute in 2010. (PageID. 305-307, 471-472). Before he joined Airbus, Plaintiff worked at International Paper as a B2 Operator, an entry level position where he unloaded roll stock, assisted with inventory, and dealt with raw materials, and at Safran Labral, where he worked as a Wire Installation Designer developing wire harnesses while also having responsibility for red line drawings. (PageID. 308-09, 471-472). Plaintiff also worked at Boeing in Seattle, Washington, where he was an in-tank aircraft sealer, as well as at Mobile Aerospace, as a Sheetmetal Mechanic and Work Leader. (PageID. 311-317).

Airbus initially hired Plaintiff Cooper in May 2019 as a Corrosion Specialist. (PageID.320). As a Corrosion Specialist, Plaintiff was responsible for training new hires, as well as making certain that the aircraft had proper sealant. (PageID. 324). Plaintiff recognized that he was working on a commercial aircraft that transports passengers and, as such, it was and is critical to adhere to standards and to be accountable for adherence to such standards. (PageID. 324-325). He received training in Canada on proper sealant and felt that he was adequately trained based on his experience and the fact that the job position of Corrosion Specialist "wasn't too complicated." (PageID. 325-

326). As a Corrosion Specialist, Plaintiff performed tasks as directed and followed work instructions. (PageID. 327).

In 2021, Plaintiff attended a listening session with Daryl Taylor ("Taylor"), Vice-President and Head of Site, as well as Dominick Guire ("Guire"), who then worked in Human Resources. (PageID. 328-329). The purpose of the meeting was to discuss the recent George Floyd tragedy with African-American employees like Plaintiff. (PageID. 331-333). During the session, Plaintiff volunteered that he had an Associate's degree. (PageID. 329-330). Following the meeting, Guire approached Plaintiff about entering the Manufacturing Engineer ("ME") program and assigned him Frederick Weigert as a mentor. (PageID. 329-330). Plaintiff applied for, and went through two interviews, before being offered the ME role, during which he represented that he had experience with "multiple programs." (PageID. 336-339). Plaintiff's move to the ME position in February 2021 resulted in a pay increase from approximately $35,000.00 per year to $75,000.00 per year. (PageID. 340). Also, in February 2021, Plaintiff utilized FMLA leave because he had COVID-19, and he was allowed to return to work thereafter. (PageID. 383-385, 485).

The ME position includes, among other things, manufacturing assessments of non-conformities, late changes to support production, on-site training of new manufacturing engineering employees, and updating master data for the documentation package accompanying the aircraft. (PageID. 346-348, 476-478, 617, 654). In addition, the ME role requires more than just the ability to master the use of software programs and tools; rather, the ME is required to employ analytical skills and properly use such programs for overall engineering of the aircraft. (PageID. 349, 568, 618). MEs, who

could be assigned anywhere throughout the FAL, to include the flightline and the flowline, are expected to work with others on the team.[1] (PageID. 334-335, 350, 617, 657). Although Plaintiff's Amended Complaint (Doc. 60) alleges that he was the only African-American engineer working in his office area on the flightline as of February 2021; the undisputed evidence shows that there were a number of African-American engineers working throughout the FAL at that point in time. (PageID. 341-346, 519).

The goal of training Plaintiff was to have him be able to work autonomously as an ME and be assigned his own aircraft. (PageID. 355-356, 618). In February 2021, Reid Stewart ("Stewart") was assigned to train Plaintiff. (PageID. 437, 619). Plaintiff contends that he should have been sent to Germany for training, as he claims all other Manufacturing Engineers were, but this contention is unsupported by any record evidence and is, in fact, contradicted by evidence in the record. (PageID. 353-355, 618, 655). Plaintiff also asserts that, pursuant to the job description for the ME role, he should have been allowed eighteen (18) months for training; however, that eighteen-month period is designated as "up to" and more specifically refers to those with no prior

---

[1] In his response to the undisputed facts set forth by Airbus in support of its motion for summary judgement, Plaintiff has "denied" many of the facts, such as here where he denies the statement that MEs could be assigned anywhere throughout the FAL. (Doc. 73 at 5; PageID. 1011). He "asserts that each position within the FAL requires a different job application and specialized training." (*Id.*). However, Plaintiff offers no record support for this assertion and the Court, having reviewed the record in depth, finds none. Rule 56(c) states, in relevant part, that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...." Fed. R. Civ. P. 56(c)(1)(A). Because Plaintiff has not supported his assertion with record evidence, the Court cannot consider Airbus's statement to be in dispute. Accordingly, throughout the Court's findings of fact, the Court has disregarded any assertions made by Plaintiff that are not supported by the evidence in the record.

experience at Airbus and only continues if a ME shows sufficient progress in mastering the role. (PageID. 351-52, 476-78, 618, 655).

On May 12, 2021, Plaintiff met with Stewart, his initial trainer, and Bruno Fiton ("Fiton"), Head of Manufacturing Engineering, to assess his progress in the first three (3) months as an ME. (PageID. 358-64, 479-82, 569, 656). That review revealed a number of areas in which Plaintiff had not progressed, including, but not limited to, knowing what a concession was, opening a concession, and knowing the difference between a non-conformity and concession. (PageID. 358-64, 479-82, 569, 656). According to Plaintiff, during that discussion, Fiton chastised Stewart for not yet covering concessions with Plaintiff. (PageID. 358-64, 479-82). At one point in time during his training with Stewart, Plaintiff accidentally threw away his notes. (PageID. 392-94).

On May 25, 2021, about two weeks after his first progress review, Plaintiff emailed Ethan Mattocks ("Mattocks"), Employee Relations Specialist and Human Resources Business Partner, regarding Stewart and issues with his training. (PageID. 364-69, 483, 656, 712). He testified that he was prompted to email Human Resources (HR) because he thought something wasn't right with his training due to Fiton's reaction. (PageID. 364-65). In the email, Plaintiff expressed his discomfort in working with Stewart and his feelings of exclusion from the team. (PageID. 712). He did not mention race or raise any concerns about racial discrimination or any racial comments being made toward him in this email. (*Id.*). Also, on the morning of May 25, 2021, Stewart told Plaintiff that he did not wish to be his trainer anymore. (PageID. 719).

In response to his May 25 email, Mattocks and Stephanie Burt ("Burt"), Director of Human Resource Operations, met with Plaintiff on May 27, 2021. (PageID. 372-74, 519, 656). During that meeting, Plaintiff did not mention race, nor did he raise concerns about any race-based statements made towards him.[2] (PageID. 372-74, 519, 656). Plaintiff did express his concern that Stewart was not providing proper training. (PageID. 373, 519, 656). He also raised issues with co-workers in his office, citing their use of Nerf guns as a source of distraction for him. (PageID. 356-358, 656). Mattocks undertook an investigation into Plaintiff's concerns, including relations amongst the team in the ME office on the Flightline. (PageID. 374-375, 519, 656). During his investigation, Mattocks learned from Jessica Davis ("Davis"), Flightline and Aircraft Delivery Manager, that Plaintiff had made comments about her Asian descent and had asked her to wrap food for him because she would have a "womanly" touch, which made her uncomfortable. (PageID. 374-375, 656, 714-33). He also learned of concerns that Davis and others had about Plaintiff's mental state at the time. (PageID. 374-375, 656, 714-33).

On or about May 31, 2021, Plaintiff emailed Mattocks about an incident that had recently occurred within the office. (PageID. 377-381, 484, 657, 735-743). Mattocks's subsequent investigation revealed a verbal altercation between Plaintiff and a co-

---

[2] In his response, Plaintiff again "denies" that he did not mention race or raise concerns about any rase-based statements made to him at the May 27 meeting; however, he does not cite any record evidence in support of this denial. (Doc. 73 at p. 8; PageID. 1013). The Court has reviewed Plaintiff's deposition testimony concerning what was discussed at this meeting and notes that Plaintiff did not testify that any part of the discussion concerned complaints based on race or any mention of race, nor did the email that Plaintiff sent to Mattocks that prompted the meeting. Accordingly, the Court must disregard Plaintiff's "denial" at this juncture in the proceedings. *See, supra*, fn 1.

worker, Alexandro Tijerina ("Tijerina"). (PageID. 382, 657, 735-43). Given Plaintiff's own concerns about his training, as well as the concerns about his interactions with his co-workers, Mattocks and Fiton made the decision to assign Plaintiff a new trainer and reiterate expectations for moving forward. (PageID. 382. 569, 658, 750-751).

In June 2021, almost immediately following his first assessment as an ME and his report regarding Stewart and activities within the flightline office, Plaintiff took FMLA leave based on his mental health. (PageID. 385-389, 486-489, 657). Initially, Elaine Greenstein in Human Resources was mistaken as to the dates that Plaintiff was seeking leave, but this was corrected, and she ensured that he was approved for the leave requested. (*Id.*). After his FMLA leave, he returned to work as an ME. (*Id.*). On June 21, 2021, following Mattocks's investigation and his period of FMLA leave, Plaintiff was issued a Return to Work Expectations Letter (the "Letter") by Mattocks and Fiton. (PageID. 395-99, 490-91, 569. 657). The Letter acknowledged some of Plaintiff's concerns with his training, as well as ongoing issues with team dynamics. (PageID. 395-99, 490-91, 569, 657). The Letter also reassigned Plaintiff to Bernard Bousquet ("Bousquet") for training purposes. (PageID. 398, 490-91, 520, 657).

Plaintiff testified that he was relieved to have a new trainer but was unhappy that he would be working in the same environment with the colleagues he had reached out to HR about; however, he admitted that he never voiced those concerns to Human Resources or management. (PageID. 400). At the time, Plaintiff did not feel like he was where he needed to be in his training after four months as an ME. (PageID. 401-02). Plaintiff testified that Bousquet told him that he didn't think Plaintiff was experienced enough for the ME position and didn't have time to be training mentees. (PageID. 405-

06). Plaintiff perceived Bousquet, who he described as having a deep voice and a strong accent, as being aggressive and/or angry. (PageID. 404-07). Plaintiff admitted that he doesn't know of anyone else who had a problem or issue in working with Bousquet and that he did help Plaintiff to some extent. (PageID. 403-410, 418, 479-480). Plaintiff, when pressed, could only support his allegation of hostile behavior on Bousquet's part by his testimony that Bousquet called him a "bullshitter" during a meeting with Mattocks on July 12, 2021. (PageID. 410-12, 480). According to Plaintiff, Mattocks did not correct Bousquet or tell him that he was out of line. (PageID. 480).

Plaintiff was assessed regarding his performance in both June and July 2021. (PageID. 427, 479-480, 658, 753-755). The July assessment revealed a number of deficiencies in Plaintiff's progress, including concerns about his analytical abilities and his capacity to handle complex engineering topics. (PageID. 658; 753). Shortly after this assessment by Bousquet, Plaintiff raised concerns about Bousquet being his trainer and again requested, and again was granted, FMLA leave for his mental health. (PageID. 421-422, 490-491, 658, 753). Plaintiff returned to work as an ME on or about July 28, 2021. (PageID. 423-425, 494-495, 658).

During his July FMLA leave, Mattocks and Fiton considered next steps for Plaintiff, including the possibility of termination, but settled upon a Performance Improvement Plan ("PIP"). (PageID. 426-38, 438-40, 496, 658-59, 762-66). In addition to the PIP, Plaintiff was reassigned to a third trainer, Eric Crosby. (PageID. 660).  The PIP set out Plaintiff's performance history and laid out specific tasks that Plaintiff was tasked with mastering within a 30-day timeline. (PageID. 426-38, 438-40, 496, 659, 762-766). The PIP also noted that there would be weekly meetings to analyze his progress.

(*Id.*). For the first week of the PIP, the goal was for Plaintiff to orient himself with the team, learn the information technology ("IT") tools necessary, and to learn the build of the aircraft; there was no formal assessment. (PageID. 440-41, 501). Consistent with the PIP, Plaintiff met with Mattocks and Fiton on August 17, 2021, where it was noted that Plaintiff was charged with three separate tasks and overall had made "favorable" progression. (PageID.441-43, 501, 571, 660, 768-782). Thereafter, on August 23, 2021, another assessment meeting took place between Plaintiff, Mattocks, and Fiton. (PageID. 443-44, 501, 660). In that meeting, it was observed that, on certain tasks, Plaintiff needed additional shadowing or training; the overall rating was unfavorable. (PageID. 444-45, 501, 660). Another meeting took place on August 31, 2021, where it was noted that Plaintiff was allowed to "redo" the tasks he had not satisfactorily demonstrated proficiency in the previous week and was given an overall "favorable" rating as it related to his progression. (PageID. 446-49, 501, 660). On September 8, 2021, another meeting took place, in which Plaintiff failed to demonstrate the necessary understanding of the aircraft issue itself, versus the IT aspect of the issue, which, in and of itself, was another basic task assigned to MEs that Plaintiff consistently failed to demonstrate. (PageID. 450-55, 511, 571, 660).

On the form for the September 8, 2021 meeting, it was noted that an additional week may be added to the PIP; however, Fiton and Mattocks determined that, consistent with the language of the PIP itself, Plaintiff did not have a chance of success as an ME, no matter how many weeks of training or how many trainers were given him, because he continued to demonstrate a lack of analytical ability that is crucial to the ME role. (PageID. 660). Fiton and Mattocks did not foresee that there would come a time

that Plaintiff could operate autonomously or be assigned his own aircraft to manage. (*Id.*). As a result, after consultation with Burt, Guire, and Taylor, the decision was made to terminate Plaintiff's employment. (PageID. 520-21, 660). On September 10, 2021, Mr. Mattocks contacted Plaintiff by telephone and informed him of his termination. (PageID. 457-58, 661). At the conclusion of the call, Plaintiff told Mr. Mattocks, "I will see you in court." (PageID. 458).

According to Airbus, the decision to terminate Plaintiff had nothing to do with his race, his prior complaints, or his FMLA leave, and Plaintiff admits that he has no evidence to the contrary. (PageID. 459-462, 463-464, 520-21, 661). No one told Plaintiff that he was terminated due to his race, the concerns he raised, or his FMLA leave usage, and no one said anything to him that lead him to such conclusions. (*Id.*). Plaintiff can name no similarly-situated ME at Airbus who was treated more favorably. (PageID. 462-63).

## V. <u>Legal Analysis</u>

Plaintiff alleges that he suffered adverse employment actions, namely being put on a Performance Improvement Plan ('PIP"), being the subject of a BOLO, having his PIP altered, and ultimately being terminated, and that these adverse employment actions were the result of unlawful race discrimination, unlawful retaliation for complaining of race discrimination and for filing an EEOC complaint, and/or unlawful retaliation for exercising FMLA leave. (Doc. 60). Airbus denies these allegations and seeks summary judgment in its favor as to each of Plaintiff's claims.

### A. <u>Race Discrimination Claim</u>

Plaintiff has brought his race discrimination claim pursuant to both Title VII and §

1981. "Title VII prohibits employers from discharging an individual, or otherwise discriminating against that person with respect to [their] terms, conditions, or privileges of employment 'because of' that person's race." *Poer v. Jefferson Cty. Comm'n*, 100 F.4th 1325, 1336 (11th Cir. 2024) (citing 42 U.S.C. § 2000e-2(a)(1)). "Section 1981, likewise, forbids employers from intentionally discriminating against employees based on their race." *Id.* (citing *Webster v. Fulton Cty.*, 283 F.3d 1254, 1256 (11th Cir. 2002). "Both Title VII and § 1981 have the same burden of proof and use an identical analytical framework." *Id.* (citing *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023)).

"To survive summary judgment, [Plaintiff] must present facts sufficient to permit a jury to find there was intentional discrimination." *Reeves v. Columbus Consol. Gov't*, No. 23-11463, 2024 WL 33903, *1 (11th Cir. Jan. 3, 2024) (citing *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 (11th Cir. 2019) (*en banc*)). Plaintiff "can do this by (1) 'present[ing] direct evidence of discriminatory intent,' (2) 'satisfying the burden-shifting framework set out in *McDonnell Douglas*,' or (3) 'demonstrat[ing] a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination.'" *Id.* (quoting *Lewis*, 918 F.3d at 1220 & n.6).

Where there is only circumstantial evidence of discrimination, courts apply the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie case of race discrimination. *Id.* To establish a prima facie case of employment discrimination, Plaintiff must show he was: 1) a member of a protected class; 2) qualified for his current

position; 3) suffered an adverse employment action; and 4) replaced by someone outside his protected class or was treated less favorably than an individual outside of his protected class. *Maynard v. Board of Regents of the Divs. of Univs. of Fla. Dept. of Ed.*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Hinson v. Clinch Cty., Ga. Bd. of Ed.*, 231 F.3d 821, 828 (11th Cir. 2000).

However, the *McDonnell Douglas* framework is not the *sine qua non* for a plaintiff to survive summary judgment. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. Of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011) (footnote omitted)). "An inference 'is not a suspicion or a guess,' but rather 'a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact.'" *Knight v. Fourteen D Enters., Inc.*, 995 F. Supp. 2d 1311, 1334 (S.D. Ala. 2014) (quoting *Smith*, 644 F.3d at 1328 n. 25).

**1. <u>Direct Evidence</u>**

A plaintiff may prevail on a discrimination claim based on race by showing direct evidence of racial discrimination. Under Eleventh Circuit law, "only the 'most blatant remarks,' whose intent could be nothing other than to discriminate, constitute direct evidence of discrimination." *Harris v. Public Health Trust of Miami-Dade Cty,* 82 F.4th 1296, 1301 (11th Cir. 2023). As the Eleventh Circuit has further explained:

> If the alleged statement suggests but, does not prove, a discriminatory motive then it is circumstantial evidence - not direct. While statements made by a decisionmaker - i.e., the one who ultimately fired, demoted, or punished the plaintiff - may constitute direct evidence, ... remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.

*Id.* (internal citations and quotation marks omitted).

The only evidence presented by Plaintiff in support of his argument that he has presented direct evidence of racial discrimination is: 1) a note prepared by Mattocks reflecting that Plaintiff told Mattocks during a conversation in the lobby that his family thought his unfair treatment was because he is black and Plaintiff's perception that Mattocks was dismissive of that remark when he replied that Airbus had a training plan in place to help him and that they would discuss this more at their scheduled meeting (PageID. 846) and 2) testimony concerning one incident of a racial slur made by a co-worker (PageID. 920). This evidence is simply not direct evidence of racial discrimination. Mattocks's response to Plaintiff's statement does not suggest, much less prove, a discriminatory motive, and a one-time slur by a co-worker who was not part of the decision-making process is not direct evidence of discrimination by the employer. *See Harris,* 82 F.4th at 1301. Plaintiff's claim, therefore, fails to survive summary judgment under the direct evidence approach.

## 2. *McDonnell Douglas* Framework

As discussed above, where there is only circumstantial evidence of discrimination, courts apply the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, an employee carries their initial burden of establishing a prima facie case of race discrimination by

"showing by a preponderance of the evidence (1) that he belongs to a protected class, (2) that he was subjected to an adverse employment action, (3) that he was qualified to perform the job in question, and (4) that his employer treated similarly situated employees outside his class more favorably." *Lewis v. City of Union City, Ga*., 918 F.3d 1213, 1220-21 (11th Cir. 2019) (internal citation and quotation omitted). If the employee meets this showing, the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse-employment action. *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). If the employer provides such a reason, the employee must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* at 1289 (11th Cir. 2005) (internal citation omitted).

In this case, Plaintiff has met the first two requirements by showing that he is a member of a protected class (black) and that he was subject to an adverse employment action (termination). Plaintiff has also alleged other adverse employment actions, namely being put on a Performance Improvement Plan ('PIP"), being the subject of a BOLO, and having his PIP altered. Because being put on a PIP and having it altered could potentially affect his continued employment, potential demotions, and potential raises, these actions would also be considered adverse employment actions, *see, e.g., Monaghan v. Worldpay U.S., Inc.,* 955 F.3d 855, 860 (11th Cir. 2020); however, Plaintiff has not proven that being the subject of a BOLO while he was on FMLA leave affected his employment and Airbus has presented evidence to the contrary. *See* PageID. 880.

Therefore, the Court finds that Plaintiff being the subject of a BOLO was not an adverse employment action.

While Airbus questions in its brief whether Plaintiff was qualified to perform the job of ME, for purposes of its motion, it is willing to assume that he was, and therefore, the Court will do so. Thus, the question presented here is whether Plaintiff has met the burden of showing that Airbus treated a similarly situated ME outside his protected class more favorably.

To prevail under the *McDonnell Douglas* framework, Plaintiff must show, through evidence, not supposition or speculation, that he and any alleged comparators were "similarly situated in all material respects." *Lewis,* 918 F.3d at 1226. "A plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they cannot be reasonably distinguished." *Id.* (internal quotation and citation omitted). Plaintiff has, at various times, identified a variety of people he claims were comparators who were treated more favorably. The crux of his complaints seems to be that others outside of his protected class were provided more and/or better training than him and that if he had been provided more or better training he would not have been terminated. In Plaintiff's response brief, he identifies Crosby, Stewart, and Tijerina as similarly situated comparators outside of his protected class who were treated more favorably. He argues that these three MEs received 18 months of training, and he did not. (Doc. 73 at p. 25; PageID. 1030). The first ground for rejecting this argument is because it is based on pure speculation. There is absolutely no evidence in the record that supports this argument. Moreover, there is no evidence in the record that shows that Plaintiff and these three MEs had similar educations or work experience, factors which obviously

would have a direct correlation with the training required and the ability to succeed in training. Most importantly, however, Plaintiff did not testify in his deposition that these three MEs were similarly situated and were treated more favorably than him. (Doc. 63-1). Likewise, in his deposition, Plaintiff conceded his inability to name another ME who could not successfully complete training who was treated more favorably. (PageID. 462-63). In addition, Plaintiff admitted that he lacked personal knowledge of any other ME being given eighteen months of training. (PageID. 469-70).

Plaintiff has identified no ME outside his protected class who engaged in the same basic conduct (including, but not limited to, inability to successfully progress in training) who was not ultimately subjected to a PIP, and upon failure to successfully complete the PIP, termination. Because Plaintiff has failed to come forward with a similarly situated comparator, he cannot establish a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, and therefore, cannot prove his race discrimination claim under this standard.

### 3. Convincing Mosaic

Even if a plaintiff cannot meet the *McDonnell Douglas* requirements, "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. Of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011) (footnote omitted)). "An inference 'is not a suspicion or a guess,' but rather 'a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact.'" *Knight v. Fourteen D Enters., Inc.*, 995 F. Supp. 2d 1311, 1334 (S.D. Ala. 2014) (quoting *Smith*, 644 F.3d at 1328 n. 25). Evidence to establish a convincing mosaic must be sufficient to overcome the lack of

comparator evidence. *McNeal v. International Paper*, Civ. A. No. 1:19-cv-602-KD-N, 2021 WL 3083035, at *8 (S.D. Ala. 2021) (quotation and citations omitted). The Court's review of the evidence presented in this case shows that Plaintiff has failed to set forth such evidence here.

"[T]he ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." *Tynes v. Fla. Dep't of Juvenile Justice*, 88 F.4th 939, 941 (11th Cir. 2023). A plaintiff may establish a "convincing mosaic" by pointing to evidence that shows, "among other things, (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1342 (11th Cir. 2023) (quotation marks omitted). "Even under the convincing mosaic framework, a plaintiff must establish that the employer's justification is pretextual." *Hudson v. Louisiana-Pac. Corp.*, No. CV 1:20-00582-JB-C, 2023 WL 8784804, at *4 (S.D. Ala. Dec. 19, 2023).

Plaintiff offers no evidence of suspicious timing. In fact, the undisputed facts set out a timeline that demonstrate Airbus's continued efforts to assist Plaintiff in his progress as an ME. Likewise, he has identified no ambiguous statements. Airbus managers were forthright with Plaintiff concerning the issues Airbus had with his performance, as exemplified by the language in his PIP. As discussed above, Plaintiff has not identified a similarly situated comparator. There is simply no evidence to support a finding that the reasons for Plaintiff's PIP, any alterations thereto, and ultimate termination were a "coverup for a discriminatory decision." *Rojas v. Fla.*, 285 F.3d 1339, 1342 (11th Cir. 2002). Even assuming for argument purposes that Plaintiff's multiple

trainers (Stewart, Bousquet, and Crosby) were wrong in their assessments regarding his analytical ability and ability to perform the position, the undisputed fact remains that Airbus had a good faith (even if mistaken) belief that Plaintiff did not, and could not, successfully perform the job responsibilities of an ME. *See, e.g., Holmes v. West Palm Beach Hous. Auth.*, 309 F.3d 752, 755 (11th Cir. 2002) ("An employer articulates a legitimate nondiscriminatory reason for termination where the employer had an honest, good faith belief in the reason for termination, even if it turns out that the employer was mistaken in that belief."). There is simply no evidence to the contrary. Plaintiff's family's belief that his treatment was race-related is not evidence, nor are Plaintiff's blanket assertions or contentions that are not supported by facts. Considering the evidence in a light most favorable to Plaintiff, he simply cannot offer a "convincing mosaic" of circumstantial evidence that raises an inference of race discrimination.

Because Plaintiff has failed to satisfy his burden of producing sufficient evidence that any adverse employment action was due to his race, Airbus's motion for summary judgment as to Plaintiff's racial discrimination claim is **GRANTED.**

## B. Retaliation Claim

"Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII case 'investigation, proceeding, or hearing.'" *Burlington Northern & Santa Fe Railway*, 548 U.S. 53, 59 (2006) (citing 42 U.S.C. § 2000e-3(a)). The same *McDonnell Douglas* burden-shifting framework applies. *Standard v. A.B.E.L Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington N.*, 548 U.S. 53.

To make out a *prima facie* case of retaliation, a Plaintiff must show: (1) he engaged in an activity protected under Title VII, (2) he experienced an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Yelling,* 82 F.4th at 1337; *Chapter 7 Trustee v. Gate Gourmet, Inc.* 683 F.3d 1249, 1257-58 (11th Cir. 2012). Provided that a plaintiff satisfies his prima facie burden, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse action. *Id.* If the employer does so, the burden shifts back to the employee to establish that the reason offered by the employer was a pretext for retaliation. *Id.*

**1. <u>Statutorily Protected Activity</u>**

A plaintiff engages in "statutorily protected conduct" when he can show that he believed in good faith that his employer engaged in unlawful employment practices and that his belief was objectively reasonable in light of the facts and record presented. *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005). To engage in statutorily protected activity, a plaintiff must "explicitly or implicitly communicate[ ] a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation and quotation marks omitted) (alteration in original). A plaintiff does not engage in statutorily protected activity when he reports general complaints of unfairness without connecting those complaints to illegal discrimination. *See Bowens v. Escambia Cnty. Bd. of Educ.*, No. 22-11560, 2023 WL 4145424, at *7 (11th Cir. June 23, 2023). "Trivial harms" are not adverse employment actions for purposes of statutorily protected activity. *See Cherry v.*

27

*Indep. Living Ctr. Of Mobile*, No. CV 1:23-00142-KD-B, 2024 WL 1053305 (S.D. Ala. Mar. 8, 2024).

Plaintiff has failed to come forward with evidence to show that he engaged in statutorily protected activity. Plaintiff offers no evidence that the concerns he raised to Mattocks in May and July were related to his race. At best, it appears that Plaintiff articulated complaints of general unfairness, citing to his co-workers' occasional use of Nerf guns in the office as a distraction to his ability to learn the job[3] and what he believed to be poor training by Stewart. Likewise, Plaintiff has failed to show a good faith, reasonable belief that Airbus's actions were those of unlawful employment conduct. *See Anduze,* 151 F. App'x at 878. Plaintiff's own admissions foreclose such a conclusion. (PageID. 372-74). Without the requisite statutorily protected activity, Plaintiff's retaliation claim fails at the *prima facie* stage.

## 2. <u>Causal Connection</u>

"To succeed on a retaliation claim, a plaintiff must show that [his] protected activity was a but-for cause of the alleged adverse action." *Yelling*, 82 F.4th at 1338; *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340-341, 140 S. Ct. 1009, 1019 (2020) (same standard for § 1981 case). The but-for standard asks whether "a particular outcome would not have happened but for the purported cause." *Bostock v. Clayton Cty, Ga.*, 590 U.S. 644, 656, 140 S. Ct. 1731, 1739 (2020) (internal citation omitted). "[A] but-for test directs us to change one thing at a time and see if the outcome changes." *Id.* "Stated another way, a plaintiff must prove

---

[3] It is undisputed that the use of Nerf guns in the office was stopped as soon as Plaintiff made a complaint about it, and those who participated were given a verbal warning. (PageID. 656, 725).

that had she not complained, she would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). A plaintiff can meet this element by offering sufficient evidence that the employer knew of the statutorily protected activity and that there was a close temporal proximity between this awareness and the adverse employment actions. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that the temporal proximity must be "very close").

Even if Plaintiff could prove that he engaged in a statutorily protected activity, he cannot establish the requisite causal connection between his alleged protected activity and his PIP and subsequent termination. The concerns Plaintiff reported to Human Resources in May of 2021 lack the requisite causal connection due to the lack of temporal proximity, as his PIP and termination occurred in August and September 2021, respectively. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (finding that a three-month period between a harassment complaint and termination did not establish a causal connection).

Even assuming for the sake of argument that Plaintiff's complaints to Human Resources constituted timely statutorily protected activity, causation still does not exist for purposes of establishing a *prima facie* case. Instead, there was an intervening cause – namely, Plaintiff's ongoing inability to demonstrate his ability to perform the ME position or to progress toward an ability to perform the position. *See Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997) ("That is, "[a]ny inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established."). Plaintiff's inability to perform the requirements of the job - not the fact that

he raised concerns several months earlier – was clearly the but-for cause of him being placed on a PIP and, ultimately, terminated.

**3. Pretext**

Even if Plaintiff could meet his burden of establishing a prima facie case of discriminatory retaliation, Airbus has established that it had a legitimate, non-discriminatory, non-retaliatory reason for issuing Plaintiff a PIP and then thereafter terminating his employment. For the reasons set forth above, Plaintiff cannot meet his burden of establishing that Airbus's reasons for its actions were false and that retaliation was the true reason. Accordingly, Airbus's motion for summary judgment on Plaintiff's retaliation claim is **GRANTED,** as well.

**C. FMLA Claim**

Plaintiff filed his original complaint in this action on August 16, 2023, alleging only claims for race discrimination in violation of Title VII and § 1981. (Doc. 1). On May 10, 2024, Plaintiff filed his first amended complaint asserting, for the first time, that his termination occurred in part due to retaliation for his having exercised his rights under the FMLA. (Doc. 31 at p. 10-11). Airbus filed a partial motion to dismiss asserting that Plaintiff's FMLA claim was barred by the two-year statute of limitations. The Court found that Plaintiff's claim, as plead at that time, violated the two-year statute of limitations because Plaintiff had not alleged facts supporting a finding of a willful violation of the FMLA. The Court, recognizing Plaintiff's *pro se* status, allowed Plaintiff an opportunity to amend his complaint to cure this deficiency, if possible. (Doc. 56).

Plaintiff thereafter filed a second amended complaint on October 9, 2024, in which he alleged that he was placed on medical leave by his physician and approved

for FMLA leave by Airbus for a period from July 12, 2021 to July 27, 2021. (Doc. 60 at p. 5). He also alleged that, on July 13, 2021, while Plaintiff was out on FMLA leave, a meeting was held between Fiton, Bousquet, and Mattocks where they discussed "retaliatory plans" to put Plaintiff on a PIP, move him to a less desirable position, and to terminate. (*Id.*). Plaintiff further alleged that "[t]his action emphasizes that Airbus acted with knowledge and reckless disregard for Plaintiffs [sic] FMLA status, demonstrating a willful violation." (*Id.*). According to Plaintiff's second amended complaint, he returned from FMLA leave on August 2, 2021, and was moved to the Flowline as an ME (from the Flightline), which Plaintiff alleged was a less desirable position, and was put on a PIP. (*Id.*). In support of his FMLA retaliation claim, Plaintiff alleged that Airbus's retaliatory actions were undertaken "knowingly and willfully and showed reckless disregard for whether such conduct was prohibited by the [FMLA]." (*Id.* at p. 8). He further alleged that "Airbus was aware of Plaintiff's protected FMLA status and engaged in retaliatory actions ... to deter him from exercising his rights under the FMLA." (*Id.*)

Airbus asserts that both Plaintiff's standard FMLA claim and his willful violation FMLA claim are time-barred. As set forth in the Court's previous order, Plaintiff's alleged standard FMLA claim is time-barred. *See* Doc. 56. Accordingly, the issue presented here is whether Plaintiff has set forth sufficient facts to establish a willful violation of the FMLA by Airbus, which would accordingly result in a finding that his claim was timely filed.

First, it is undisputed that Plaintiff received all the FMLA leave that he requested. This was true both in June 2021 and in July 2021, just as it was in February 2021. (PageID. 383-89, 421-22, 424-25, 485-88, 492-95, 657-58). Likewise, Plaintiff was

allowed to return to work as a Manufacturing Engineer following all three periods of leave. (*Id.*). Plaintiff has neither alleged a claim for inference with his FMLA rights in his amended complaint nor has he proven one. Instead, Plaintiff asserts a claim of retaliation for exercising his FMLA rights. (Doc. 60 at pp. 7-8).

Plaintiff may prove his claim of FMLA retaliation by presenting direct evidence of retaliation or circumstantial evidence of retaliation. *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010). As the Eleventh Circuit has explained, "[t]he rights granted by the FMLA are not absolute," and an "'employee can be dismissed, preventing [him] from exercising [his] right to commence FMLA leave, without [the employer] violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave.'" *Aponte v. Brown & Brown of Fla., Inc.*, 806 F. App'x 824, 831 (11th Cir. 2020) (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010)). Thus, to establish a claim of FMLA retaliation, Plaintiff must prove Airbus's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001).

To establish FMLA retaliation by presenting direct evidence, Plaintiff must present evidence which demonstrates "the intent to discriminate against individuals who invoke their FMLA rights." *Kaylor v. Fannin Reg'l Hosp., Inc.*, 946 F. Supp. 988, 1000 (N.D. Ga. 1996) ("[I]f an employer states, '[Y]ou are fired because you used FMLA leave,' the discharged employee may use that statement to establish a prima facie case of FMLA discrimination."). However, "only the most blatant remarks which evince the intent to discriminate against individuals who invoke their FMLA rights can constitute

direct evidence of FMLA discrimination." *Id.; see also Yoosun Han v. Emory Univ.*, 658 F. App'x 543, 548 (11th Cir. 2016) ("Despite Han's assertions, when read in context, her supervisor's deposition statements do not show any direct evidence of retaliation, as they lack any reflection of a retaliatory attitude or discriminatory animus. The statements Han alleges show direct evidence regarding the termination make it clear that Han was not fired for taking FMLA leave, but for repeated acts of insubordination."). Here, there is no direct evidence of FMLA retaliation by Airbus. Plaintiff admits that he was given all the leave he requested. (PageID. 383-89. 421-22, 424-25). He identifies no statements by anyone in Airbus Human Resources or management indicating that any action was taken against him due to his taking leave or that his leave somehow presented a problem. Therefore, Plaintiff has failed to make a sufficient showing of FMLA retaliation by direct evidence.

Where, as here, there is no direct evidence of retaliatory motive or intent, the burden-shifting analysis of *McDonnell Douglas* applies, and the ultimate burden of proving intentional retaliation rests with Plaintiff. *See Schaaf*, 602 F.3d at 1243. Under this framework, Plaintiff must prove that: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there exists a causal connection between his protected activity and the adverse employment action. *Id.* Because Plaintiff indisputably availed himself of a protected right under the FMLA and suffered an adverse employment decision, the sole issue to be considered is whether there exists a causal connection between Plaintiff exercising his right to FMLA leave and him being placed on a PIP and, ultimately, terminated.

In his brief, the sole evidence presented by Plaintiff in support of his claim of FMLA retaliation is that, on July 13, 2021, while he was on leave, Airbus decisionmakers "discussed moving Plaintiff to the flowline, putting him on a PIP, and termination, showing a causal connection and establishing pretext." (Doc. 73 at p. 27). Unfortunately for Plaintiff, this blanket statement without any personal knowledge or testimony from someone with personal knowledge supporting a link between Plaintiff taking FMLA leave and these actions is not sufficient to make a showing of a causal connection or pretext in light of the uncontroverted evidence to the contrary presented by Airbus. As discussed in the uncontroverted declarations submitted by Airbus's HR personnel and managers who were involved in the decision-making process vis-à-vis Plaintiff, which are supported by contemporaneously-made writings, Plaintiff's continued inability to learn the functions of, and perform even the most basic tasks of, an ME had been documented since May of 2021, before his June and July 2021 FMLA leaves, and were the reason for Airbus's actions. (PageID. 569-70, 580, 587, 656-58). The PIP was instituted, as it had been with other employees, to aid Plaintiff in learning the tasks necessary for an ME and to provide a roadmap for him, his trainers, and his manager to properly access his progress and as an effort to continue his employment as an ME. (PageID. 520, 570-71, 594-97, 619, 658-60). Airbus's ultimate decision to terminate Plaintiff's employment came more than a month after he returned from leave, after he failed to successfully complete the tasks set out in the PIP and when it became apparent that he could not succeed in the ME role. (PageID. 520, 572, 590, 613, 620, 660). There is no evidence, circumstantial or otherwise, to support a finding that Plaintiff's periods of FMLA leave had anything to do with his PIP and/or his termination.

Indeed, the only evidence is to the contrary. (PageID. 521-22, 573, 621, 661). Plaintiff's multiple prior FMLA leave periods that were approved and taken without incident further demonstrate that Airbus did not harbor any retaliatory animus toward him for taking FMLA leave. *See Dillon v. Carlton*, 977 F. Supp. 1155, 1159 (M.D. Fla. 1997), *aff'd*, 161 F.3d 21 (11th Cir. 1998) (granting summary judgment for defendant on plaintiff's FMLA claims and holding that there is nothing to suggest defendant "harbored a secret motive" to deny plaintiff's FMLA rights or to retaliate against her for asserting those rights, and that, to the contrary, "it is undisputed that [plaintiff's] previous FMLA leave requests had been granted, without incident.").

The FMLA "does not insulate an employee who has requested medical leave from being terminated for poor performance." *Gamba v. City of Sunrise*, 157 F. App'x 112, 113 (11th Cir. 2005). "Where the employer produces significant evidence of the employee's poor performance, it is not enough that the request for leave and the termination are closely related in time." *Id.* (citing *Wascura v. City of South Miami,* 257 F.3d 1238, 1248 (11th Cir. 2001)). There is simply no evidence to support Plaintiff's argument that Airbus retaliated against him for exercising his rights under the FMLA. Therefore, Plaintiff's FMLA retaliation claim also fails as a matter of law, and accordingly, Airbus's motion for summary judgment on Plaintiff's FMLA retaliation claim is **GRANTED.**

## VI. <u>Conclusion</u>

For the reasons set forth above, the Motion for Summary Judgment (Doc. 66)

filed by Defendant Airbus Americas, Inc. is **GRANTED** as to all claims made by Plaintiff in this action.

      **DONE** and **ORDERED** this the **28th** day of **January, 2025**.

                                        <u>s/P. BRADLEY MURRAY</u>
                                        UNITED STATES MAGISTRATE JUDGE